O

NO JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CV 12-09631 DDP (MANx) |
| Plaintiff, | ) | |
| v. | ) | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| THE ZAKEN CORP., a California corporation also d/b/a The Zaken Corproation, QuickSell and QuickSell and TIRAN ZAKEN, individually and as an officer of The Zaken Corp., | ) | [Dkt. No. 52] |
| Defendants. | ) | |

Presently before the court is Plaintiff's Motion for Summary Judgment. Having considered the submissions of the parties, the court is inclined to grant the motion and adopt the following order.

**I. Background**

Defendants (collectively, "Zaken") offer a "Wealth Building Home Business Plan" to consumers.[1] (Declaration of Dani Stagg, Ex. D at 44.) For $148.00, plus shipping, purchasers become Associates

---

[1] This order uses the term "consumer" and "purchaser" interchangeably.

of QuikSell Liquidations and receive a "kit" including instructions on how to locate excess inventories, "'[i]nsider' secret techniques," "powerful and proven strategies," "a simple seven-word phrase that <u>instantly</u> pays [purchasers] cash profits," and other information. (<u>Id.</u> at 57-58, 97.)  Zaken also offers purchasers additional "tools" for an additional charge. (Stagg Dec., Ex. E. at 85-86.)

Under Zaken's plan, consumers identify businesses seeking to liquidate excess inventory. Consumers then notify Zaken, which may proceed to negotiate an acquisition of the excess merchandise. If Zaken is successful in 1) buying the products identified by the consumer and 2) reselling the products at a profit, then Zaken pays purchasers fifty percent of the net proceeds. (<u>Id.</u> at 52-53.) Zaken advertises a "realistic ballpark figure" estimate that "2 to 4 hours a week working this business will earn [participants] an average of $3,000 to $6,0000." (Stagg Dec. Ex. D. at 61.)

Effective March 1, 2012, the Federal Trade Commission broadened the scope of its "Business Opportunity Rule," 16 CFR § 437.0 <u>et seq.</u>, the earliest form of which was first promulgated in 1978. 76 FR 76816. Prior versions of the rule regulated and imposed certain disclosure requirements upon the sale of business opportunities, but only those costing over $500. 76 FR 76818. The 2012 revision eliminated this monetary threshold. 76 FR 76821. The 2012 changes also seek "to address the sale of deceptive work-at home schemes, where unfair and deceptive practices have been both prevalent and persistent." 76 FR 76826. The FTC elaborated that "[s]ellers of fraudulent work-at-home opportunities deceive their victims with promises of an ongoing relationship in which the

seller will buy the output that business opportunity purchasers produce, often misrepresenting to purchasers that there is a market for the purchasers' goods and services," and that these schemes "frequently dupe consumers with false earnings claims." Id.

On November 9, 2012, Plaintiff filed a complaint against Defendants for violations of the FTC's Business Opportunity Rule and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

## II. Legal Standard

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 323.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial."

3

Anderson, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not the court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1278 (9th Cir. 1996). Counsel has an obligation to lay out their support clearly. Carmen v. San Francisco Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). The court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposition papers with adequate references so that it could conveniently be found." Id.

**III. Discussion**

A. Section 5(a) of the FTC Act

Section 5(a) of the FTC Act prohibits unfair or deceptive acts or practices in or affecting commerce, and provides for injunctive and equitable relief against violators. 15 U.S.C. § 45(a); F.T.C. v. Network Servs. Depot, Inc., 617 F.3d 1127, 1138 (9th Cir. 2010). A practice or representation is deceptive if it is likely to mislead consumers acting reasonably under the circumstances, and is

4

material. F.T.C. v. Stefanchik, 559 F.3d 924, 928 (9th Cir. 2009). Courts look to the overall impression conveyed by a representation, and not merely to literal truth. F.T.C. v. Cyberspace.Com LLC, 453 F.3d 1196, 1200 (9th Cir. 2006).

While Zaken disputes that it violated Section 5(a) of the FTC Act, it provides no argument, authority, or evidence to support that position. Plaintiff, in contrast, cites to numerous instances in which Zaken directly or indirectly represented that purchasers of Defendants' business opportunity would earn substantial income. Defendants, for example, explicitly guaranteed that the "entire good-faith deposit of $148 will be sent right back" if consumers "haven't made at least $4,000" and they "return the kit" in the first thirty days of purchase. (Pl.'s Ex. 11, Attach. F.) Defendants suggested that such an outcome was unlikely, representing, for example, that "the average commission check [associates] get . . . will be approximately $4,280!" and presenting a "realistic ballpark figure" estimate that "2 to 4 hours a week working this business will earn [participants] an average of $3,000 to $6,0000" (Pl.'s Ex. 12 at 67:15-15;) Stagg Decl., Ex. D. at 61.)

In truth, purchasers of Defendants' business opportunity have not earned a substantial income. (Pl.'s Ex. 29, Attach. A.) Over the business's ten-year history, over 100,000 consumers bought the basic QuikSell kit for $148. Fewer than 1% of consumers ever earned any income at all. Consumers collectively earned approximately $260,000 in sales commission payments, based on available records and testimonials. (Pl.'s Ex. 29, Attach. A.) In 2011 and 2013, not a single consumer made any income using

5

QuikSell. (Id.)  In 2012, Zaken paid commissions to only five QuikSell purchasers, and those commissions were a fraction of the amounts Zaken claimed consumers would earn. (Pl.'s Ex. 29, Attach. A.)

Consumers spent an additional $10,130,433 total on other QuikSell "upsell" tools. (Pl.'s Ex. 30, Attach. A.)  Some consumers were encouraged to "spend [an additional] $2,300" to purchase one such tool if they were "serious about this business and . . . really want[ed] to make the kind of money others have made."(Yee Dep., Pl.'s Ex. 14 at 105:21-23) .  This particular tool, however, consisted of largely outdated telephone numbers of companies who were out of business. (Yee Dep., Pl.'s Ex. 14 at 108:15-21.)

It was reasonable for consumers to rely on Zaken's representations. The Government need not prove that each individual consumer relied on the deceptive acts or practices. FTC. v. Commerce Planet, Inc., 878 F.Supp.2d 1048, 1072 (C.D. Cal. 2012). Here, reliance is shown by the undisputed fact that more than 110,000 consumers bought Zaken's products.  FTC v. Figgie Int'l, Inc., 994 F.2d 595, 605-6 (9th Cir. 1993).  Further, it was reasonable for consumers to believe that Defendants' statements of earnings potential represented typical or average earnings. FTC v. Medicor LLC, 217 F. Supp. 2d 1048, 1053-54 (C.D. Cal. 2002); FTC v. Data Med. Capital, Inc., No. SA CV 99-1266 AHS, 2010 WL 1049977 at * 27 (C.D. Cal. Jan. 15, 2010).

Defendants' misrepresentations were material. A misleading impression is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." Commerce Planet, Inc., 878

6

F.Supp.2d at 1063 (citing FTC v. Cyberspace.com, LLC, 453 F.3d 1196, 1201 (9th Cir.2006)). Express claims concerning the earnings potential of business opportunities are presumed to be material, as the potential to earn a profit is an essential consideration for anyone considering purchasing a business opportunity. FTC v. Febre, 1996 WL 396117 at *2 (N.D. Cal. 1996.) Defendants' misrepresentations of potentially large earnings in exchange for very little work were explicitly presented to consumers in advertisements, with titles like "Start Locating lots of deals and Make BIG MONEY mailing out this Postcard."(Pl.'s Ex. 24, Attach. B.)  These express claims concerned the earnings potential of QuikSell associates, an essential consideration for anyone considering purchasing this program. As such, these misrepresentations were material.  Plaintiffs have established that Defendants violated Section 5.

B.   Business Opportunity Rule

As described in this court's earlier order, effective March 1, 2012, the Federal Trade Commission broadened the scope of its "Business Opportunity Rule," 16 CFR § 437.0 et seq., the earliest form of which was first promulgated in 1978. 76 FR 76816.  Prior versions of the rule regulated and imposed certain disclosure requirements upon the sale of business opportunities, but only those costing over $500.  76 FR 76818.  The 2012 revision eliminated this monetary threshold.  76 FR 76821.  The 2012 changes also seek "to address the sale of deceptive work-at home schemes, where unfair and deceptive practices have been both prevalent and persistent."  76 FR 76826.  The FTC elaborated that "[s]ellers of fraudulent work-at-home opportunities deceive their victims with

promises of an ongoing relationship in which the seller will buy the output that business opportunity purchasers produce, often misrepresenting to purchasers that there is a market for the purchasers' goods and services," and that these schemes "frequently dupe consumers with false earnings claims." Id.

The Rule defines a business opportunity as a commercial arrangement in which:

> (1) A seller solicits a prospective purchaser to enter into a new business; and
>
> (2) The prospective purchaser makes a required payment; and
>
> (3) The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will:
>
> (i) Provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased, controlled, or paid for by the purchaser; or
>
> (ii) Provide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services; or
>
> (iii) Buy back any or all of the goods or services that the purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including but not limited to providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

16 C.F.R. § 437.1(c).

The first two elements of the Rule's inquiry are clearly met here.

As to third prong, Plaintiff contends that sub-prongs (ii) and (iii), the "outlet" and "buy back" provisions, apply to Zaken's QuikSell program.

"Providing outlets, accounts, or customers means furnishing the prospective purchaser with existing or potential locations,

8

outlets, accounts, or customers . . . or otherwise assisting the prospective purchaser in obtaining his or her own locations, outlets, accounts or customers . . . ." 16 C.F.R. § 437.1(m).

At the preliminary injunction stage, it was unclear from the record presented whether Zaken represented to consumers that it would take certain actions, or, alternatively, only that it might take those actions. Now, after the completion of discovery, the court is satisfied that Zaken represented that it would act. One mailing, for example, claimed that Zaken's product and method would yield "deals that *WILL* sell fast and *WILL* produce commission checks for [consumers]!" (Ex. 11G.) Indeed, Zaken "absolutely guarantee[d]" consumers' "success." (Ex. 1 at 4.) Implicit in these statements is the representation that Zaken would take the steps necessary for consumers to earn commissions.

The question remains whether those steps constitute the furnishing of "customers" or "outlets" to consumers, or assistance in finding customers or outlets. "When a statute does not define a term, a court should construe that term in accordance with its 'ordinary, contemporary, common meaning.'" Cleveland v. City of Los Angeles, 420 F.3d 981, 988 (9th Cir. 2005) (quoting San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004).). Courts may look to dictionary definitions to determine the "plain meaning" of a term. Id. at 1034. A customer is "one that purchases a commodity or service." Merriam-Webster Online Dictionary, Merriam-Webster, Inc., http://www.merriam-webster.com (June 2014). An outlet is "a market for a commodity." Id.

Plaintiff's argument is slightly inconsistent. Plaintiff argues that "Zaken was the sole customer who bought the service offered by [consumers]," but also that Zaken "would provide outlets for [consumers'] services – *i.e.*, third-party buyers of liquidated merchandise." (Mot. at 17.) Third-party buyers of merchandise, however, did not comprise the market for consumers' services. Rather, as suggested by Plaintiff, Zaken itself made up the entirety of that market.

At the preliminary injunction phase, this court noted that it was unclear whether consumers could or did provide information to entities other than Zaken. On summary judgment, Plaintiff asserts, and Zaken does not dispute, that consumers "could only earn money from Zaken." (Mot. at 16.) To the extent that Zaken's conditional promise to pay consumers a portion of any realized profits constituted a "purchase" of information, Zaken was consumers' customer. Even putting aside that question aside, however, it appears that Zaken was also the sole outlet for consumers' services. There is no evidence that consumers did, or could, provide "lead finding" information to anyone other than Zaken itself.

To summarize, Zaken was the only market for consumers' services. Consumers could only receive commissions if Zaken made use of those services. Zaken guaranteed that consumers would receive commission checks. Thus, at the very least, Zaken implicitly represented to consumers that it would provide them with an outlet for their services, namely, Zaken itself. Zaken's

QuikSell program therefore falls within the ambit of the Business Opportunity Rule.[2]

### C. Scope of Relief

Almost the entirety of Zaken's opposition to the instant motion is directed at the relief sought by Plaintiff. Specifically, Zaken argues that (1) the proposed lifetime ban on Tiran Zaken's involvement in marketing work-at-home business opportunities is overbroad and punitive and (2) the proposed $25 million judgment lacks evidentiary support, particularly with respect to Tiran Zaken's scienter. (Opp. at 2.)

#### 1. Injunctive Relief

In "proper cases," the FTC may seek a permanent injunction. 15 U.S.C. § 53(b). The scope of injunctive relief depends on the facts of the particular case, and should be tailored to prevent future violations. See F.T.C. v. John Beck Amazing Profits LLC, 888 F.Supp.2d 1006, 1012 (C.D. Cal. 2012). Violators of the FTC act "must expect some 'fencing in.'" Sears, Roebuck and Co. v. F.T.C., 676 F.2d 385, 391 (9th Cir. 1982). Relevant factors include the degree of scienter, frequency of violative acts, the defendant's ability to commit future violations, the degree of harm consumers suffered, and the defendant's recognition of his own culpability. FTC v. Commerce Planet, Inc., 878 F.Supp.2d 1048, 1086 (C.D. Cal. 2012).

A lifetime ban is appropriate here. As president of The Zaken Corp., Tiran Zaken oversaw most Zaken departments, including

---

[2] Having so concluded, the court need not address whether the QuikSell program also constitutes a "buy back" under 16 C.F.R. § 437.1(c)(3)(iii).

11

1  QuikSell. (Id. at 52, 53, 56.) He approved the advertising of
2  QuikSell and reviewed all of the Zaken Corp.'s marketing materials
3  prior to their disbursement. (Zaken Dep., Pl.'s Ex. 12 at 54-55.)
4  Though it is somewhat unclear from the record when Zaken's
5  misrepresentations began, Plaintiff has submitted a plethora of
6  examples of misrepresentations made in direct mailings,
7  advertisements, and product materials.  Over a ten year span, Zaken
8  sold the QuikSell program to over 110,000 consumers.  Of those, the
9  evidence submitted indicates that over 99.8% never earned any
10 commissions whatsoever.  Fewer than 9,000 consumers received
11 refunds of the $148 purchase price.  Furthermore, many consumers
12 were taken in by Zaken's exhortations to "invest" additional money,
13 sometimes thousands of dollars, in additional QuikSell "tools."
14 (E.g., Ex. 14 at 105:21-23.)
15      Nor does Zaken appear contrite about his decade of deceptive
16 conduct.  To the contrary, Zaken firmly stands behind the marketing
17 tactics of his "legitimate" business opportunity, and has insisted
18 that at no time did he ever believe consumers were misled by
19 QuikSell's advertisements. (Zaken Dep., Pl.'s Ex. 12 at 65:21-22.)
20 The risk of future misconduct is high.  Though Zaken claims that he
21 "is out of the distressed merchandise business for good," (Zaken
22 Decl. 2 ¶¶ 2, 4), he appears to intend to, if permitted, continue
23 marketing work-at-home business opportunities.  Here, his
24 misrepresentations had less to do with "the distressed merchandise
25 business" than with the illusory benefits of a work-at-home
26 business "opportunity" of precisely the type Zaken intends to keep
27 marketing.  Zaken's proposed alternative injunction, which would
28 replace the lifetime ban with essentially a "follow the law"

12

injunction forbidding him from violating the Business Opportunity Rule, would be wholly inadequate to protect consumers in the future.[3]

2. Restitution

i. Individual Liability

Courts may award equitable monetary relief in the form of restitution or disgorgement. Commerce Planet, 878 F.Supp.2d at 1088-89. Tiran Zaken may only be held individually liable, however, "if (1) he participated directly in the deceptive acts *or* had the authority to control them and (2) he had knowledge of the misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth." Stefanchik, 559 F.3d at 931.

Tiran Zaken does not dispute that, as president of the Zaken Corp., he had authority to control the misrepresentations about the QuikSell program. (Opp. at 17.) Zaken contends, however, that he did not intentionally or recklessly deceive consumers. To support his contention, Zaken cites testimonials from "high earner" QuikSell consumers, Mr. Zaken's own success "using the principles of the QuikSell program," and substantial earnings consumers made "on their own after learning the QuickSell program." (Id.)

As an initial matter, Zaken points to no evidence to support the assertion that some people went on to make money after learning

---

[3] Nor is the court persuaded that a lifetime ban would inordinately burden Zaken or prevent him from earning a livelihood. As Zaken himself states, he earned between $100,000 and $200,000 per year in the distressed merchandise industry before ever entering the work-at-home marketing industry.

13

QuikSell. Second, Zaken's own personal experience making $100,000 to $200,000 in the distressed merchandise industry has little bearing on the experiences of over 110,000 consumers, whose paltry earnings figures were readily available to Zaken. Lastly, Zaken's supposed reliance on testimonials from "high earners" appears to be based on one of his own advertisements, which includes 14 short quotes from supposed QuikSell associates. (Ex 11 at 42.) While the quotes are attributed to named individuals, all are unsworn, and some are as short as four words. Even crediting each of these 14 testimonials as true, Zaken's reliance on them, in the face of dozens of consumer complaints and the fact that the overwhelming majority of QuikSell associates never saw a dime from the program, constitutes intentional avoidance of the truth, at best.

### iii. Amount of Restitution

"Consumer loss is calculated by 'the amount of money paid by the consumers, less any refunds made." Commerce Planet, 878 F.Supp.2d. at 1088. The FTC bears the burden of providing a reasonable estimate of the appropriate monetary relief. Id. The burden then shifts to Defendant to show that the FTC's calculations are inaccurate. Id.

The FTC calculates consumer losses of $25,666,437. Zaken sold Quiksell to 113,596 consumers at $148 per kit, and issued 8,623 refunds, for a net total of $15,536,004. Zaken sold another $10,130,433 of upsell tools, for a grand total of $25,666,437.

Zaken first argues that the FTC's figure is not a reasonable approximation because it is based on all of Zaken's sales between 2003 and 2013, even though the record only contains evidence of misrepresentations from 2010-2013. The FTC replies that Zaken

14

represented that it produced all documents relating to its marketing of QuikSell, from 2003 to the present. Tiran Zaken testified at his deposition that he could not identify the year in which advertisements were used because, "I mean, like, they're all similar." (Ex. 36.) The FTC's estimate is a reasonable approximation of consumers' losses resulting from Zaken's misrepresentations.

Zaken next posits that amounts paid to consumers as commissions, and chargebacks, should be deducted from the FTC's estimate. Zaken points to no evidence that any chargebacks occurred, let alone the amount of such chargebacks, and has thus failed to carry its burden with respect to those amounts. Zaken has, however, provided evidence that it paid out $259,656 in commissions. (Ex. 29A.) Though commissions and refunds are different in nature, consumer losses were mitigated, to some small degree, by these payments. Accordingly, a reduction in the amount of commissions paid is warranted. The court therefore awards restitution of $25,406,781 for consumer redress.[4]

**IV. Conclusion**

For the reasons stated above, Plaintiff's Motion for Summary Judgment is GRANTED, on all counts. The court awards restitution of $25,406,781 and finds injunctive relief warranted in the form proposed by Plaintiff. Plaintiff is ordered to file a proposed

---

[4] Defendants' opposition focuses almost entirely on the argument that the FTC has not met its initial burden to reasonably approximate the appropriate amount of monetary relief. (Opp. at 21-23.) The commissions figure, discussed above, is the only quantified inaccuracy identified by Defendants.

15

judgment and injunction in accordance with this Order within ten days of the issuance of this Order.

IT IS SO ORDERED.


Dated: September 18, 2014

DEAN D. PREGERSON
United States District Judge

16